## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **CRIM. NO. 15-739 (PAD)** |
| **SALLY LOPEZ MARTINEZ (2),** **IVONNE M. FALCON NIEVES (4),** **MARIELIS FALCON NIEVES (9),** **GLENN O. RIVERA PIZARRO (10),** | |
| **Defendants.** | |

### MEMORANDUM AND ORDER

Delgado-Hernández, District Judge.

Before the court is Sally López Martínez' "Urgent Motion for Bail Pending Appeal or Temporary Release Due to Her Incarceration at FCT Danbury a COVID-19 Hotspot" (Docket No. 1455), which the Government opposed (Docket No. 1459). Ms. López replied (Docket No. 1470). A close review of the record and relevant caselaw persuades the court that Ms. López' motion should be denied.

## I.     DISCUSSION

### A.  Standard of Review

Ms. López requests that bail be granted pending appeal (Docket No. 1455, p. 1). The release or detention of a defendant pending appeal is governed by 18 U.S.C. § 3143(b). To that end, the court must detain a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of Section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for writ of *certiorari*. See, 18 U.S..C. § 3143(b)(2). In all other cases, the judicial officer shall order that a person who has been found

guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of *certiorari*, be detained unless the judicial officer finds; (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section § 3142(b) or (c); and (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in: (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.  Id.  § 3143(b)(1).

**B.** **Arguments**

**i.** **Substantial Question of Law**

Ms. López argues there is a substantial question of law and fact likely to result in reversal, new trial or reduced sentence (Docket No. 1455, p. 7).  In the main, the court agrees with the government's observations at Docket No. 1459.  But it will address Ms. López' contention that there is a problem justifying bail because the prosecution tried the case on the theory that a corrupt agreement need not be tied to a specific act and it sufficed to show that she understood that she was expected to exercise some influence on the payor's behalf as opportunities arose (Docket No. 1479, p. 5).  She claims "some influence" represents an "undisclosed self-dealing" or "conflict of interest theory" explicitly rejected in Skilling v. United States, 561 U.S. 358, 409 (2010).  Id.

Undisclosed self-dealing and conflict-of-interest theories arose from various decisions interpreting the phrase "scheme or artifice to defraud" in the original mail fraud statute of 1842, to encompass not only deprivations of money or property but also certain "intangible rights," Skilling, 561 U.S. at 399-400, including honest services and good government.  See, United States v. Freedman, 568 F.Supp. 450, 453 (N.D.Ill. 1983)("It is too late to argue, as an original

USA v. Hernández-Pérez
Criminal No. 15-739 (PAD)
Memorandum and Order
Page 3

proposition, that it strains that statutory language to embrace 'intangible rights' schemes to defraud – such as those by public officials to deprive their constituencies of the right to good government or honest services")(collecting cases).

On this account, even if a scheme occasioned a money or property gain for the betrayed party, courts reasoned that actionable harm lay in the denial of that party's right to the offender's "honest services."  Skilling, 561 U.S. at 400.  So, a scheme to "get a public contract on more favorable terms than would be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public."  Id. (quoting Shushan v. United States, 117 F.2d 110, 115 (1941)).  In 1987, however, the development of the "intangible rights" line of cases, and thus the honest-services doctrine, came to a halt with the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987).

That case involved a state political party chairman, Hunt, whose selection of Kentucky's insurance agent was contingent upon an arrangement to procure a share of the agent's commissions through kickbacks paid to various insurance companies designated by Hunt as political patronage. Under the Government's theory of mail fraud, the fraud occurred when Hunt, Gray (a public official), and McNally (a private business person), set up a fake insurance agency to receive some of the commissions.  The Supreme Court reversed the convictions, holding that the mail fraud statute did not refer to the intangible right of the citizenry to good government, adding that "[i]f Congress desire[d] to go further, it must speak more clearly than it has."  Id.

Congress responded by adopting 18 U.S.C. § 1346, which provides: "For the purposes of [Chapter 63 of Title 18 of the United States Code ("Mail Fraud and Other Fraud Offenses")], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  In this way, the statute restored the mail fraud statute to its

USA v. Hernández-Pérez
Criminal No. 15-739 (PAD)
Memorandum and Order
Page 4

pre-McNally position, incorporating those decisions of the Courts of Appeals recognizing an intangible right to honest services.  See, Skilling, 561 U.S. at 402, 404-405 (commenting on effect of decision).

In 2010 the Supreme Court decided Skilling, holding that Section 1346 is constitutional, but only when confined in scope to the core pre-McNally applications involving bribes and kickbacks.  Id. at 408-409.  In this sense, Skilling eliminated all sub-theories of honest services fraud that do not require bribes or kickbacks.  Had the counts of conviction in Ms. López' case rested solely on undisclosed self-dealing or the concealment of a conflict of interest, they might well fail under the Skilling holding.  But that is not the case here.

Furthermore, the Supreme Court explained that Section 1346's prohibition on bribes and kickbacks "draws content" from federal statutes "proscribing – and defining – similar crimes," including 18 U.S.C. § 201(b), § 666, and from "pre-McNally case law."  See, Skilling, 561 U.S. at 412.  To this end, it cited three cases as examples of using federal statutes to define honest-services bribery: United States v. Whitfield, 590 F.3d 325, 352-353 (5th Cir. 2009), *cert. denied* 131 S.Ct. 124 (2010); United States v. Ganim, 510 F.3d 134, 147-149 (2d Cir. 2007); and United States v. Kemp, 500 F.3d 257, 281-286 (3d Cir. 2007)).  In each of these cases, the courts upheld convictions for honest-services bribery based on ongoing courses of conduct – where things of value were provided to the official in exchange for official acts performed as opportunities arose – and rejected the requirement that a specific official act be identified at the time of payment.  See, Whitfield, 590 F.3d at 353; Ganim, 510 F.3d at 142, 148-149; and Kempt, 500 F.3d at 281-282.

Along the same line, in a case decided one month after Skilling, the First Circuit found (in a decision in which Justice Souter joined the panel) that a state legislator who took payments in order to arrange meetings between health insurers and his client could constitute honest services

fraud on a bribery theory, even absent payment for a vote or other explicit action.  The Court

explained that:

> Legislators can and do convene meetings of constituents and seek to
> settle quarrels among them; but taking a bribe for the use of one's
> governmental power is a different matter and within the ambit of honest
> services fraud … What distinguishes this aspect of the case from some
> others is that the bribe was not for Celona to press or oppose legislation
> directly through his votes; rather, the purchased use of official power
> was the implied threat of such action- and also the potential use of
> influence over legislation in committee -that Celona conveyed largely
> by implication through the orchestrated meetings.  But the distance
> between this and paying outright for legislative votes is not great: both
> involve the misuse of office.

United States v. Urciuoli, 613 F.3d 11, 16-17 (1st Cir. 2010), *cert. denied*, 131 S.Ct. 612 (2010).

Along the same line, in United States v. McDonough, 727 F.3d 143 (1st Cir. 2013), the First Circuit

pointed out that "[b]ribery can be accomplished through an ongoing course of conduct, so long as

the evidence shows that the 'favors and gifts flowing to a public official [are] in exchange for a

pattern of official actions favorable to the donor.'" Id. at 154.[1]

Ms. López contends that in McDonnell v. United States, 136 S.Ct. 2355 (2016), the

Supreme Court clarified than in order to qualify as a bribe, what is expected in exchange or in

return for the bribe must be a properly defined official act sufficiently specific and focused at the

moment at which the public official accepts a payment (Docket No. 1470, p. 6).  She acknowledges

that McDonnell does not explicitly rule out a stream of benefits theory, but claims that it requires

that when periodic payments are made, the parties contemplated specific concrete actions that were

to be taken.  Id.

---

[1] The First Circuit observed that such a theory is known as a "stream of benefits" theory.  See. Woodward v. United States, 905 F.3d 40, 46 (1st Cir. 2018)(describing a stream of benefits prosecution approach as one wherein a government official is charged with entering into an ongoing agreement to accept benefits in exchange for providing government business to the briber)(quoting United States v. López-Cotto, 884 F.3d 1, 8 (1st Cir. 2018)).

In Woodward, 905 F.3d at 40, the First Circuit indicated that McDonnell did not discuss the stream of benefits theory, not out of disapproval of it, but rather because it was not implicated in that case. Id. at 48. It noted that McDonnell did not take up whether the government had adequately proven a nexus between gratuities that the defendant received and the acts he allegedly undertook as a result. So, it concluded expressing confidence that a stream of benefits theory of bribery remains valid today. Id.

Ms. López hones in on United States v. Silver, 948 F.3d 538 (2d Cir. 2020), where, among other things, the Court held that bribery requires that an official accept a payment, knowing that he is expected to use his office to influence a focused, concrete, and specific question or matter that may be understood to refer to a formal exercise of governmental power. Id. at 557. But here there were specific, concrete matters on which Ms. López acted as she received bribes. And as Silver recognized, circumstantial evidence demonstrating an understanding between the payor and the official will often be sufficient for the government to identify a properly focused and concrete question or mater. Id. Thus, the court is not persuaded that there is a close question on this topic. The evidence adduced by the government at trial was sufficient to establish beyond a reasonable doubt, defendant's participation in the scheme for which she was convicted.[2]

**ii.        Correctional Facility**

Ms. López requests temporary release or transfer to home confinement (Docket No. 1455, p. 1). She directs the court's attention to the situation at FCI Danbury, where she is confined, in light of the COVID-19 pandemic; the Attorney General's Directive to the Bureau of Prisons; and litigation over the Warden and staff of FCI Danbury to take the Attorney General's exhortations

---

[2] Ms. López did not file a post-sentencing motion for judgment of acquittal or new trial. As for the codefendants' motions in that regard, the court anticipates a ruling within the next days.

seriously (Docket No. 1455, pp, 1-5). With her request, she included a "Ruling on Motion for Temporary Restraining Order and Motion to Dismiss" issued by the United States District Court for the District of Connecticut (Docket No. 1455-1), and a Declaration of Dr. Jaimie Meyer pursuant to 28 U.S.C. § 1746. (Docket No. 1455-2).

Ms. López asserts that she has high blood pressure but is not otherwise in an established medically vulnerable category (Docket No. 1455, p. 3).[3] She avers that she filed a request for compassionate release with the Warden on or about April 14, 2020, and that her request was denied on the sole ground that she had not yet served 50% of her sentence, which she claims is a totally arbitrary ground for denying relief during the COVID-19 medical emergency. Id. at 4.

The court cannot underestimate the seriousness of the situation caused by the pandemic. But it notes that the District of Connecticut has issued a comprehensive order requiring the Warden of CFI Danbury to take immediate measures to establish a process by which inmates can be evaluated promptly for home confinement and compassionate release with the urgency reflected in the Attorney General's memorandum of April 3, 2020 (Docket No. 1455-1, pp. 68-73).[4] In these circumstances, the court is confident that at this juncture, the steps and oversight undertaken by the District of Connecticut in connection with CFI Danbury adequately address Ms. López' concerns about safety, temporary release, and home incarceration.[5]

---

[3] The government notes that Ms. López did not submit documentation to substantiate the high blood pressure claim (Docket No. 1459, p. 7 n. 1).

[4] The District Court denied the petitioning party's request for a temporary restraining order to the extent that it asked the Court to direct the Warden to implement safety measures and report to the Court on the status of those measures (Docket No. 1455-1, pp. 61-62). The Court stated that there were factual disputes concerning the Warden's implementation of measures to protect against the spread of COVID-19, and noted that perhaps recognizing the conflicting factual record on mitigation and safety measures, the petitioners submitted a proposed order that did not include an order directing the Warden to implement the various measures at issue, most of which the Warden contends she is already implementing. Id. at 61.

[5] Review of the Docket in Civil No. 20-0569 (MPS) before the U.S. District Court for the District of Connecticut

## II.    <u>CONCLUSION</u>

For the reasons stated, Ms. López' motion for bail pending appeal, home confinement or temporary release due to her incarceration at FCI Danbury (Docket No. 1455) is DENIED.

**SO ORDERED.**

In San Juan, Puerto Rico, this 21st day of July, 2020.

<u>s/ Pedro A. Delgado-Hernández</u>
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge

---

confirms that the Court has been actively monitoring developments in the litigation.